**TAX COURT OF NEW JERSEY**



**JOSHUA D. NOVIN**
**Judge**

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL**
**OF THE TAX COURT COMMITTEE ON OPINIONS**

September 13, 2021

Andrew Kessler, Esq.
Saiber LLC
18 Columbia Turnpike, Suite 200
Florham Park, New Jersey 07932

Lawrence P. Cohen, Esq.
Lavery, Selvaggi, Abromitis & Cohen, P.C.
1001 Route 516
Hackettstown, New Jersey 07840

> Re:     Green Eagle Property Resources, LP v. Mansfield Township
>         Docket Nos. 009897-2014, 003285-2015, 002372-2016,
>         <u>001715-2017, and 004237-2018</u>

Dear Mr. Kessler and Mr. Cohen:

This letter constitutes the court's opinion following trial of the local property tax appeals filed by plaintiff, Green Eagle Property Resources, LP ("Green Eagle"). Green Eagle challenges the 2014, 2015, 2016, 2017, and 2018 tax year assessments on its improved property located in Mansfield Township ("Mansfield").

For the reasons stated more fully below, the court reduces the 2014, 2015, 2016, 2017, and 2018 local property tax assessments.

## I.   Procedural History and Factual Findings

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony introduced during trial.






As of the valuation dates, Green Eagle was the owner of the property located at 1885 State Route 57, Mansfield Township, Warren County, New Jersey (the "subject property"). The subject property is identified on Mansfield's municipal tax map as Block 1105, Lot 12.01.

As of the valuation dates at issue, the subject property was improved with a one-story community shopping center, built in or about 2000, commonly known as Mansfield Commons.[1] The shopping center is divided into two separate buildings. The first building, located along the western boundary of the subject property, is a masonry one-story Walmart comprising approximately 123,519 square feet ("Building One"). The second building comprises approximately 145,627 square feet and includes three large retail stores, an 88,830 square foot Kohl's department store, a 21,674 square foot Marshalls department store, and a 15,000 square foot Party City store ("Building Two"). Building Two also includes eleven smaller "in-line" retail stores ranging in size from 1,200 to 4,000 square feet. Adjacent to Building Two on the subject property's eastern boundary, is an Arby's fast-food restaurant, comprising approximately 2,900 square feet. The Arby's restaurant is included in Building Two's total square footage. Thus, the subject property contains a total of 272,046 square feet of leasable area, inclusive of the Arby's restaurant.

Although the subject property comprises a single lot of approximately 36.6-acres, Building One is allocated approximately 15.76 acres of the real property, and Building Two and the

---

[1] A community shopping center "reflects a general merchandise or convenience concept and typically encompasses 100,000 to 350,000 square feet of gross leasable area, including anchors, on 10 to 40 acres. A community shopping center will typically have two or more anchors (discount department, supermarket, drug, home improvement, large specialty discount) with a 40% to 60% anchor ratio (the share of a center's total square footage that is attributable to its anchors) and a primary trade area (the area from which 60% to 80% of the center's sales originate) or 3 to 6 miles." Appraisal Institute, The Dictionary of Real Estate Appraisal, 232 (5th ed. 2010).






restaurant pad site are allocated approximately 20.84 acres of the real property. During trial, Green Eagle described the two buildings in the shopping center as one economic unit, while Mansfield characterized the buildings as having a synergistic nature.

The subject property is located at the intersection of Route 57 and Airport Road in Mansfield. The property contains approximately 2,331 feet of frontage along State Route 57, and a depth of approximately 691 feet, and is level at street grade. The site is serviced by public utilities, including municipal sewer and water, natural gas, electric, and telephone. The subject property is in Flood Hazard Zone C, denoting an elevation "higher than the elevation of the 0.2-percent-annual-chance flood."[2]

The subject property is situated in Mansfield's B-2 – Business District with permitted uses that include retail sales establishments, offices, office buildings, indoor recreational facilities, hotels and motels, and municipal buildings operated for public purposes. Thus, operation of a community shopping center on the subject property is a legally conforming use.

Green Eagle timely filed complaints challenging the subject property's 2014, 2015, 2016, 2017, and 2018 tax year assessments. The court tried the matters to conclusion over several days.

During trial, testimony was elicited from one of Green Eagle's principals, John Orrico. In addition, Green Eagle and Mansfield each offered testimony from New Jersey certified general real estate appraisers, who were accepted by the court, without objection, as experts in the field of real property valuation. Each expert prepared an appraisal report containing photographs of the subject property and expressing opinions of the subject property's true value as of the October 1, 2013, October 1, 2014, October 1, 2015, October 1, 2016, and October 1, 2017 valuation dates.

---

[2] https://www.fema.gov/glossary/flood-zones.






As of each valuation date, the subject property's local property tax assessment, implied

equalized value, and the experts' value conclusion are set forth below:

| Valuation date | Tax Assessment | Average ratio of assessed to true value | Implied equalized Value | Green Eagle's expert | Mansfield's expert |
|---|---|---|---|---|---|
| 10/1/2013 | $33,190,600 | 100% | $33,190,600 | $25,500,000 | $47,880,000 |
| 10/1/2014 | $33,190,600 | 96.21% | $34,498,077 | $25,800,000 | $48,240,000 |
| 10/1/2015 | $33,190,600 | 94.67% | $35,059,258 | $25,800,000 | $48,290,000 |
| 10/1/2016 | $33,190,600 | 94.14% | $35,256,639 | $25,800,000 | $48,460,000 |
| 10/1/2017 | $33,190,600 | 92.62% | $35,835,241 | $25,800,000 | $48,390,000 |

Prior to the commencement of trial, Green Eagle and Mansfield stipulated several issues.[3]

Additionally, during trial, Green Eagle and Mansfield stipulated the replacement cost new of

Building One, inclusive of a 10% entrepreneurial profit, and 15% physical depreciation, under the

cost approach. Green Eagle and Mansfield further amended their stipulation, agreeing that the

---

[3] The following matters were stipulated to: (a) the subject property is identified on Mansfield's municipal tax map as Block 1105, Lot 12.01; (b) the real property consists of approximately 36.6 acres; (c) the subject property is in Mansfield's B-2 Business District, with the existing uses complying with Mansfield's municipal zoning ordinances; (d) the subject property is improved with a community shopping center constructed in approximately 2000; (e) the subject property is divided into two building sections and contains a separate restaurant pad site. The first section includes a masonry one-story Walmart consisting of 123,519 square feet. The second section includes three large retail stores: an 88,830 square foot Kohl's department store, a 21,674 square foot Marshalls department store, and a 15,000 square foot Party City store. The second section also includes eleven small "in-line" retail stores ranging in size from 1,200 to 4,000 square feet; (f) the subject property has a gross leasable area of 272,046 square feet, including a 2,900 square foot Arby's fast food restaurant pad site; (g) the subject property contains 1,700 parking spaces with 800 spaces allocated to the Walmart site; (h) the local property tax assessment on the subject property for the 2014, 2015, 2016, 2017, and 2018 tax years was $33,190,600; (i) Mansfield's average ratio of assessed to true value was: (1) 100% in 2014, (2) 96.21% in 2015, (3) 94.67% in 2016, (4) 94.14% in 2017, and (5) 92.62% in 2018; and (j) the highest and best use of the subject property is continued use as a community shopping center. During trial, Green Eagle and Mansfield supplemented their stipulation, agreeing to a value of $1,492 per parking space. Thus, the net value of the 800 parking spaces allocated to Building One was $1,193,600 (800 x $1,492 = $1,193,600). Green Eagle and Mansfield subsequently amended their stipulation, agreeing that the subject property has 1,395 parking spaces, with 615 parking spaces being allocated to Building One.






subject property has 1,395 parking spaces, with 615 parking spaces being allocated to Building One.[4] At the outset, the court finds that the parties stipulated value of $1,492 per parking space is reasonable. Therefore, the net value of the 615 parking spaces allocated to Building One should be $917,580 (615 parking spaces x $1,492 per parking space = $917,580).

Thus, three central issues remain in dispute between Green Eagle and Mansfield: (i) what is (are) the appropriate approach(es) to value the subject property, and what is the subject property's true value under that (those) approach (es); (ii) if employing a hybrid approach to value the subject property (part cost approach and part income capitalization approach), what amount, if any, should be attributable to the alleged functional obsolescence of Building One under the cost approach; and (iii) if employing a hybrid approach to value the subject property (part cost approach and part income capitalization approach), what is the appropriate method to determine the value of the land lying beneath Building One under the cost approach.

During trial, Green Eagle offered testimony from John Orrico, President of National Realty and Development Corp. ("National Realty"), and owner of Green Eagle. In his capacity as President of National Realty, Mr. Orrico is responsible for overseeing the management and operations of National Realty, including but not limited to leasing, construction/development, and legal matters. National Realty manages approximately seventy properties in fourteen states, comprising more than 20,000,000 square feet of shopping centers, with the balance comprising

---

[4] During trial, Green Eagle and Mansfield did not submit a revised calculation of the value of the parking spaces allocated to Building One. Accordingly, after trial, the court inquired whether Green Eagle and Mansfield agreed to the reduced stipulated value of the 615 parking spaces allocated to Building One, $917,580 (615 x $1,492 per parking space = $917,580), versus the $1,193,600 (800 x $1,492 per parking space = $1,193,600) initial stipulation. Green Eagle submitted that "it is within the court's determination whether to calculate such change." Conversely, Mansfield submitted that "no further calculation is required."






office buildings, warehouses, and residential complexes. In Mr. Orrico's estimation, Mansfield is one of the smallest markets that National Realty maintains a community shopping center. National Realty also owns and manages other community shopping centers in New Jersey, including centers located in Manville (Somerset County), Pohatcong (Warren County), Clinton (Hunterdon County), Shrewsbury (Monmouth County), and Holmdel (Monmouth County).

According to Mr. Orrico, the anchor tenants are the "drivers" of traffic to shopping centers. Typically, a landlord will first secure an anchor tenant(s), followed by the in-line tenants. As a result, the in-line tenant leases are usually tied to the anchor tenants' lease and occupancy. Thus, if an anchor tenant vacates or its store goes dark, the in-line tenants may have options to reduce the rent payable or terminate their lease. These provisions are what are commonly referred to as cotenancy clauses.[5]

Mr. Orrico further testified that Walmart's tenancy in Building One arose under a ground lease. National Realty owns the land and afforded Walmart the right to use the land and construct a building thereon to Walmart's specifications. Walmart owns the building and is solely responsible for structural repairs to and maintenance of the building. Upon expiration of the ground lease, the improvements revert to National Realty.

Based on Mr. Orrico's experience, prior lease negotiations, and approximately ten lease transactions that National Realty has entered into with Walmart, including several locations in New Jersey, Walmart wants to equip its stores with a grocery component to offer an additional

---

[5]  A contenancy clause "permits tenants to terminate a lease if the landlord has not replaced an anchor tenant . . . within a predetermined period." Appraisal Institute, The Appraisal of Real Estate, 473 (14th ed. 2013).






customer draw and revenue source.[6] [7]   As a result, Walmart has generally sought to either reconfigure or enlarge its existing stores, or to transition to a larger "Super Stores" footprint, to offer that grocery component.  In Mr. Orrico's experience, the Walmart "Super Stores" offering a grocery component are 160,000 to 190,000 square feet, with the grocery component occupying 35,000 to 40,000 square feet.  Here, Building One comprises approximately 123,519 square feet, and in Mr. Orrico's opinion, does not meet Walmart's current specifications for a "Super Store."

## I.   Conclusions of Law

### A.   Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity."  MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998).  "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous."  Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985).  "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced."  Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998).  A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value.  See Pantasote Co., 100 N.J. at 413.  That is, evidence "definite, positive and certain in quality and

---

[6]   Mr. Orrico offered testimony that in National Realty's Pohatcong shopping center, Walmart expressed an intention to vacate and move to a space with a larger footprint.  Accordingly, National Realty exercised an option it possessed for adjacent property and entered into a ground lease with Walmart enabling Walmart to construct a larger store containing a grocery component.  However, Walmart remained responsible for "back filling" or finding new tenants for its formerly occupied space in the Pohatcong shopping center.  Ultimately, National Realty found tenants willing to accept Walmart's former space; however, National Realty had to undertake extensive renovations to portions of the space to accommodate one of the new tenants.

[7]   Mr. Orrico further offered testimony that in National Realty's Manville shopping center, National Realty reconfigured an area formerly occupied by A&P and extended the area occupied by Walmart, affording them greater square footage to add a grocery component.






quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the taxpayers' proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. East Orange City, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. Summit City, 188 N.J. Super. 34, 38-39 (App. Div. 1982)). Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is nonetheless required to determine if the party challenging the tax assessment has overcome the presumption of validity. If the court concludes that a challenging party has not carried the requisite burden, dismissal of the action is warranted under R. 4:40-1 and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

At the close of Green Eagle's proofs, Mansfield moved to dismiss these matters under R. 4:37-2(b). Affording Green Eagle all reasonable and legitimate inferences which could be deduced from the evidence presented, the court concluded that Green Eagle produced cogent evidence






sufficient to overcome the presumption of validity. The opinions of Green Eagle's expert, if accepted as true, raised debatable questions as to the validity of the subject property's tax assessments. Accordingly, the court denied Mansfield's motion and placed a statement of reasons on the record.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer. . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15 (citing Pantasote Co., 100 N.J. at 413).

### B. Highest and Best Use

"For local property tax purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). The determination of the highest and best use of a property is "the first and most important step in the valuation process." Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988), aff'd, 127 N.J. 290 (1992). The highest and best use analysis involves the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack






Twp., 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015).

Here, Green Eagle and Mansfield stipulated, and the court agrees, that the highest and best use of the subject property as vacant and as improved, is as a community shopping center.

C. Valuation

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); see also ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 544 (1963)); see also WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax 610, 619 (Tax 1985). ). However, when the proofs submitted in support of one approach overshadow those submitted in support of any other approach, the court may conclude which approach should prevail. ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244; Pennwalt Corp. v. Holmdel Twp., 4 N.J. Tax 51 (Tax 1982).

Here, Green Eagle's expert primarily relied on and found the income capitalization approach the most credible method of deriving the subject property's true value. Conversely, Mansfield's expert employed a hybrid method, employing the cost approach, to determine a value






for Building One, the sales comparison approach to determine a value for the land beneath Building One, and employing the income capitalization approach, to determine a value for Building Two and the restaurant pad site. Although Green Eagle's expert found it to be a less reliable valuation method, he also employed a hybrid approach to value the subject property, using the cost approach to value Building One and the income capitalization approach to value Building Two, the restaurant pad site, and the land. Thus, the critical difference between the experts' hybrid approaches involved how they arrived at a value for the land beneath Building One.

For the reasons expressed herein, the court agrees with the conclusion reached by Green Eagle's expert, finding that the income capitalization approach is best suited for determining the subject property's true value. The court recognizes that a hybrid methodology (part income capitalization approach and part cost approach) may be used to derive the true or fair market value of a property. See Livingston Mall Corp. v. Livingston Twp., 15 N.J. Tax 505, 508-09 (Tax 1996) (valuing three ground leased anchor stores under the cost approach and valuing the non-anchor stores and concourse under the income capitalization approach); Aliotta v. Belleville Twp., 27 N.J. Tax 419, 427 (Tax 2013) (concluding that a "hybrid valuation approach is reasonable because of the subject's unique uses"). However, for the reasons set forth herein, the court finds that the hybrid approaches employed by the experts present unique challenges and obstacles in arriving at an accurate value for the land beneath Building One, rendering its usefulness suspect.

Here, credible testimony was elicited in the record from Mr. Orrico and the experts that the subject property is income-producing. Moreover, as detailed by both Green Eagle's expert and Mansfield's expert, sufficient credible evidence exists in the marketplace to employ the income capitalization approach to derive the subject property's value. When a property is income-producing, the income capitalization approach is the "preferred method for estimating the value of






income producing property." Forsgate Ventures IX, L.L.C. v. Twp. of South Hackensack, 29 N.J. Tax 28, 46 (Tax 2016), aff'd, 31 N.J. Tax 135 (App. Div. 2018). See Parkway Vill. Apartments Co. v. Cranford, 108 N.J. 266, 269 (1987) (concluding that "[t]he income method is generally preferred for assessing income-producing property"); TD Bank v. City of Hackensack, 28 N.J. Tax 363, 378 (Tax 2015); Shav Associates v. Middletown Twp., 11 N.J. Tax 569, 578 (Tax 1991).

Accordingly, the court will rely on the income capitalization approach to determine the subject property's true or fair market value.

### 1. Income Capitalization Approach

"The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." The Appraisal of Real Estate, 439 (14th ed. 2013). See Parkway Village Apartments Co. v. Cranford Twp., 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Princeton Borough, 16 N.J. Tax 68 (Tax 1996).

Central to the income capitalization approach is "the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments Co., 108 N.J. at 270. The term market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." Appraisal Institute, The Dictionary of Real Estate Appraisal, 121-22 (5th ed. 2010). The economic or market rent allows an appraiser to accurately






forecast the stream of income to be generated by a property and to convert that future benefit into a present value.

### A. Market or Economic Rent

The term economic or market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." Appraisal Institute, The Dictionary of Real Estate Appraisal, 121-22 (5th ed. 2010). The economic or market rent attributable to a property may differ substantially from the actual rent derived on a property, which may be below market rates. Parkview Village Assocs. v. Collingswood Bor., 62 N.J. 21, 29-30 (1972). However, "this does not mean that the actual rent is to be disregarded . . . 'in determining what is fair rental income, the actual rental income, while not controlling, is an element to be considered.'" McCrory Stores Corp. v. Asbury Park, 89 N.J. Super. 234, 243 (App. Div. 1965) (quoting Somers v. City of Meriden, 174 A. 184, 186 (Sup. Ct. Err. 1934)).

### 1. Green Eagle's expert

To compute economic rent, Green Eagle's expert first classified the subject property's tenancies into three distinct size categories: (i) "Big Box" or anchor stores, comprising 88,000 to 130,000 square feet (the Walmart and Kohl's); (ii) "Mid-Size" stores, comprising 15,000 to 20,000 square feet (the Marshall's and Party City); and (iii) in-line retail stores, comprising 1,200 to 4,000 square feet. Then, based on discussions with Mr. Orrico and his experience as an appraiser, Green Eagle's expert testified that generally, the "Big Box" or anchor tenants will pay the lowest rent in the shopping center because the anchor tenant drives business to the shopping center and serves as






an attraction for other smaller tenants to occupy retail space in the shopping center. Thus, the anchor tenant enjoys the most leverage to secure the lowest market rent.

### a. Big Box or anchor

Green Eagle's expert identified five retail leases of "Big Box" or anchor tenancies that he found comparable to the subject property. For purposes of his appraisal report, these leases were identified as comparable leases 1, 2, 3, 4, and 5. Three of the comparable leases were in National Realty owned community shopping centers, one in Manville (Somerset County), and two in Pohatcong (Warren County). The remaining two comparable leases were in Howell Township (Monmouth County). The comparable leases comprised leased areas of 42,430 to 164,387 square feet.[8] The leases bore commencement dates between May 2012 and July 2014. The unadjusted rents ranged from $5.25 to $11.50 per square foot. In determining the effective rent for the five comparable leases, Green Eagle's expert computed the average rent over the lease term. See First Republic Corp. of Am. v. East Newark Bor., 16 N.J. Tax 568, 578 (Tax 1997).

Green Eagle's expert applied a -5% location adjustment to comparable leases 1, 2, 3, 4, and 5. After analyzing New Jersey Department of Transportation traffic counts, he observed that the traffic counts of the comparable lease locations were between 40% to 70% higher than that of the subject property. Accordingly, he applied a "nominal" -5% location adjustment. In addition, Green Eagle's expert applied size adjustments of +5% to comparable lease 1, and -5% to comparable lease 5. Importantly, during cross-examination, in assessing whether a size adjustment

---

[8] Comparable lease 2 (56,330 square feet) and comparable lease 3 (42,430 square feet) are in National Realty's Pohatcong community shopping center and were formerly occupied by Walmart. After Walmart vacated the property, approximately 30,000 square feet of the Walmart space was demolished, and the space was divided into two separate retail areas. One, a 56,330 square feet retail store (comparable 2), and the other, a 42,430 square feet retail store (comparable 3).






was warranted to comparable lease 2 and comparable lease 3, despite these two retail stores being separate, distinct, and independent from each other, Green Eagle's expert acknowledged that he considered comparable lease 2 and comparable lease 3 as the same tenant.

After applying the adjustments, the adjusted rents of the five comparable leases ranged from $5.00 to $10.93 per square foot. After analyzing the adjusted rents, Green Eagle's expert concluded an economic or market rent of $8.50 per square foot for the "Big Box" or anchor retail space in the subject property. Green Eagle's expert applied the $8.50 per square foot economic rent to 212,349 square feet, comprising Building One (123,519 square feet) and the Kohl's in Building Two (88,830 square feet).

b. Mid-size

Green Eagle's expert then identified five retail leases of "Mid-Size" retail stores he found comparable to the subject property. His appraisal report identified those leases as comparable leases 6, 7, 8, 9, and 10. All five of the comparable leases were in National Realty owned community shopping centers, two in Manville (Somerset County), one in Shrewsbury (Monmouth County), one in Pohatcong (Warren County), and one in Holmdel (Monmouth County). The comparable leases comprised leased areas of 15,000 to 42,430 square feet. Two of the comparable leases were subject property leases (the Marshalls and the Party City leases). The leases bore commencement dates between January 2011 and May 2017. The unadjusted rents ranged from $9.00 to $12.46 per square foot. In determining the effective rent for the five comparable leases, Green Eagle's expert again computed the average rent over the lease term. See First Republic Corp. of Am., 16 N.J. Tax at 578.

Green Eagle's expert applied a -5% location adjustment to comparable leases 8, 9, and 10. Again, after analyzing New Jersey Department of Transportation traffic counts, Green Eagle's






expert concluded that the traffic counts in these locations were superior to the subject property; accordingly, he applied a -5% location adjustment.

After applying the adjustment, the adjusted rents of the five comparable "Mid-Size" leases ranged from $8.55 to $12.46 per square foot. After analyzing the adjusted rents, Green Eagle's expert concluded an economic or market rent of $11.00 per square foot for the "Mid-Size" retail space in the subject property. Green Eagle's expert applied the $11.00 per square foot economic rent to 36,674 square feet of the subject property's shopping center, comprising the Marshalls (21,674 square feet) and Party City (15,000 square feet) in Building Two.

      c.    Small, in-line

Finally, Green Eagle's expert identified three retail leases of in-line stores he found comparable to the subject property. Those leases were identified as comparable leases 11, 12, and 13 in his appraisal report. All three comparable leases were in Mansfield. The comparable leases comprised leased areas of 1,181 to 1,325 square feet. The leases bore commencement dates between December 2013 and November 2014. The unadjusted rents ranged from $14.85 to $20.40 per square foot. In determining the effective rent for the five comparable leases, Green Eagle's expert again computed the average rent over the lease term. See First Republic Corp. of Am., 16 N.J. Tax at 578.

Green Eagle's expert applied no adjustments to comparable leases 11, 12, and 13. After analyzing the comparable in-line rents, Green Eagle's expert concluded an economic or market rent of $18.00 per square foot for the subject property's in-line retail space. Green Eagle's expert applied the $18.00 per square foot economic rent to 23,023 square feet of the subject property's in-line retail stores.






2. Mansfield's expert

Like Green Eagle's expert, Mansfield's expert classified the subject property's tenancies into three types: (i) anchor; (ii) "Junior anchor" or "mid-sized"; and (iii) in-line retail.[9] However, in Mansfield's expert opinion, the subject property had only one anchor tenant, the Walmart occupying Building One, which he separately valued using the cost approach. In Mansfield's expert's opinion, the Kohl's, Marshalls, and Party City were "Junior anchor" or mid-sized tenants. In Mansfield's expert's opinion, the "Junior anchor" or "mid-sized" retail space comprises stores greater than 15,000 square feet, and the in-line retail space comprises stores less than 15,000 square feet. Importantly, Mansfield's expert stated that although Building One and Building Two are not physically attached, a "synergy" exists between the two buildings.

a. Anchor

In Mansfield's expert's opinion, the subject property did not include any anchor tenants that should be valued under the income capitalization approach. Therefore, Mansfield's expert did not furnish the court with any comparable anchor tenant leases or conclude a market or economic rent attributable to an anchor tenant.

b. Junior anchor and mid-sized

Mansfield's expert identified four retail leases of "Junior anchor" or "mid-sized" stores he found comparable to the subject property. His appraisal report identified those leases as comparable leases 1, 2, 3, and 4. The leased locations were in Rockaway Township (Morris County), Randolph (Morris County), East Hanover (Morris County), and Totowa (Passaic

---

[9] In his appraisal report, Mansfield's expert characterized the Walmart in Building One as the primary anchor in the subject property's shopping center. However, he valued Building One under the cost approach, thereby attributing no value under the income capitalization approach.






County). The comparable leases comprised leased areas of 23,000 to 55,398 square feet. The leases bore commencement dates between June 2010 and January 2015. The unadjusted rents ranged from $16.20 to $19.50 per square foot. In determining the effective rent for the four comparable leases, Mansfield's expert also computed the average rent over the lease term. See First Republic Corp. of Am., 16 N.J. Tax at 578.

Mansfield's expert applied a -15% adjustment for lease type to comparable lease 1. Comparable lease 1 was a modified gross lease compared to the subject property's leases and the other comparable leases, which were net leases. Thus, in Mansfield's expert's estimation, a -15% adjustment accounted for the expense difference between a net lease and a modified gross lease.

The adjusted rents of the four comparable leases ranged from $14.70 to $19.50 per square foot. After analyzing the adjusted rents, Mansfield's expert concluded an economic or market rent of $17.00 per square foot for the subject property's "Junior anchor" and mid-sized retail space. Mansfield's expert applied the $17.00 per square foot economic rent to Building Two's 125,504 square feet of retail space comprising the Kohl's, Marshalls, and Party City (88,830 + 21,674 +15,000 = 125,504 square feet).[10]

  c. In-line

Mansfield's expert identified six retail leases of in-line stores that he found comparable to the subject property. Those leases were identified as comparable leases 5, 6, 7, 8, 9, and 10 in his appraisal report. Three of the comparable in-line leases were in Mansfield, and three were in Rockaway Township (Morris County). The comparable leases comprised leased areas of 1,296 to

---

[10] Mansfield's expert's appraisal report states the square footage applicable to the Kohl's, Marshalls, and Party City to be 125,437 square feet. However, during trial, Green Eagle and Mansfield stipulated to a 125,504 square foot computation.






7,011 square feet. The leases bore commencement dates between August 2012 and April 2015. The unadjusted rents ranged from $20.40 to $37.00 per square foot. In determining the effective rent for the six comparable leases, Mansfield's expert again computed the average rent over the lease term. See First Republic Corp. of Am., 16 N.J. Tax at 578.

Mansfield's expert applied no adjustments to comparable leases 5, 6, 7, 8, 9, and 10. After analyzing the rents, Mansfield's expert concluded an economic or market rent of $22.00 per square foot for the subject property's in-line retail space. Mansfield's expert applied the $22.00 per square foot economic rent to 23,023 square feet of the subject property's in-line retail stores.

3. Analysis

The court finds the experts' attempts to characterize or group the subject property's retail tenancies into specific classes or categories based almost purely on square footage is subjective. Just as no two snowflakes are alike, no two shopping centers can be said to be identical; each possesses unique and distinct characteristics, challenges, and attributes. Thus, the categorization of a retail store as mid-size, because it occupies 35,000 square feet, may be true in one center; however, in another center, a retail store occupying 35,000 square feet may be viewed as an anchor tenant. Accordingly, the court's focus is not on the size parameters employed by the experts to classify a retail footprint as an anchor or mid-sized. Rather, the court's focus is on comparing similarly sized retail stores located in similarly comprised community shopping centers and discerning the economic or market rent of the retail stores existing therein.

As detailed in Mr. Orrico's testimony and confirmed by the experts, anchor tenants generally occupy a large area of a community shopping center's retail footprint and are the primary attraction of customers to a shopping center. Therefore, they are the driving force of business to the center and possess greater negotiating power and pay lower rent than that charged mid-size or






in-line retail tenants. Moreover, the identity of a shopping center's anchor tenant often can be confirmed by a review of the leases of the smaller, mid-sized or in-line tenants. If the smaller, mid-sized or in-line tenant leases contain cotenancy clauses, identifying one or more larger tenants in the shopping center, those larger tenants are viewed as anchor tenants.[11]

Here, the testimony and evidence introduced during trial disclosed that the subject property's community shopping center is situated on an average-sized lot for the size of the building improvements. Consequently, it possesses a ratio of gross land area (1,594,296 square feet, or 36.6 acres), to building improvements (272,046 square feet), of 5.86 to 1. Stated differently, the building improvements occupy approximately 17% of the land area. The Walmart occupies approximately 45% of the retail area, Kohl's occupies approximately 33% of the retail area, Marshalls occupies approximately 8% of the retail area, Party City occupies approximately 5.5% of the retail area, and small, in-line retail tenants occupy the remaining 8.5%. According to Mr. Orrico, several of the subject property's leases contain contenancy provisions permitting them to vacate should Walmart or Kohls vacate.[12]

The court finds the testimony of Mr. Orrico credible, that not only does the subject property's owner view the Walmart and Kohl's as anchor tenants, but the subject property's mid-size and in-line retail tenants similarly view the Walmart and Kohl's as anchor tenants. Moreover, the court observes that the Walmart occupies approximately 45%, and the Kohl's occupies approximately 33% of the subject property's retail area. Thus, each store occupies material portions of the subject property's retail areas. Accordingly, the court finds that the Walmart and

---

[11] A contenancy clause "permits tenants to terminate a lease if the landlord has not replaced an anchor tenant . . . within a predetermined period." The Appraisal of Real Estate, at 473.

[12] The cotenancy clauses in several of the in-line retail stores leases referenced the former anchor tenant, A&P, which retail area is now being principally occupied by Kohl's.






Kohl's are anchor tenants in the subject community shopping center and will apply an anchor economic rent to the 123,519 square feet occupied by the Walmart in Building One, and the 88,830 square feet occupied by the Kohl's in Building Two.

a. Anchor

The court's review of Green Eagle's expert's comparable leases 1, 2, 3, 4, and 5 disclose that each lease is in community shopping centers similarly sized to the subject, ranging from 225,000 to 294,000 square feet of gross leasable area. Moreover, each of the leases are in shopping centers having comparable ratios of land area to building: (i) 3.57 to 1; (ii) 7.42 to 1; and (iii) 5.61 to 1. Further, each shopping center was constructed within twenty years of one another and was of like age, material, quality, and condition. Thus, the court is satisfied that each of the comparable leases identified by Green Eagle's expert are in community shopping centers like the subject property's community shopping center.

Here, the testimony of Mr. Orrico was that the size/footprint of the Walmart and Kohl's, and their influence in the subject property's shopping center, rendered them anchor tenants. However, unlike the Walmart and Kohl's, that comprise 45% and 33% of the subject property's retail area, Green Eagle's expert's comparable leases 2, 3, and 5 comprise only 19.4%, 14.6%, and 21.3% of the retail areas in their respective shopping centers. Importantly, Green Eagle's expert did not furnish testimony or evidence with respect to the influence or impact that comparable leases 2, 3, and 5 have in their respective shopping centers. During trial, no evidence was produced that the leases for the in-line retail tenants in those shopping centers contained cotenancy clauses affording them the right to vacate should the tenants occupying comparable lease 2, 3, and 5 vacate their stores. For these reasons, the court does find that Green Eagle's expert's comparable leases 2, 3, and 5 amount to anchor tenants in each of their respective shopping centers. Therefore, they

   

are not comparable to the subject property's anchor tenants, rendering their lease information of suspect value in discerning the economic rent of anchor tenants in the marketplace.

Finding Green Eagle's expert's comparable leases 1 and 4 the most accurate and representative evidence of economic or market rent for the subject property's anchor tenants, the court finds that an $8.90 per square foot rent should be attributed to the 212,349 square feet of anchor retail area in the subject property's shopping center as of October 1, 2013, October 1, 2014, October 1, 2015, October 1, 2016, and October 1, 2017 valuation dates.

### b. Mid-size and junior anchor

The subject property's mid-size and junior anchor tenants occupy retail stores totaling 36,674 square feet (21,674 + 15,000 = 36,674), comprising approximately 13.5% of the subject property's retail area.

The court's review of Green Eagle's expert's comparable leases 6, 7, 8, 9, and 10 discloses that each lease is in community shopping centers similarly sized to the subject, ranging from 184,261 to 272,046 square feet of gross leasable area.[13]  In addition, comparable leases 6, 7, 8, 9, and 10 comprise between 5.5% and 20.1% of the retail area in their respective shopping centers. Moreover, although comparable leases 7 and 8 were executed in 2011, approximately twenty months prior to the first valuation date involved herein, based on the testimony of Mr. Orrico and Green Eagle's expert, that there was little fluctuation experienced in the market for mid-sized retail areas between 2011 and 2017, the court finds that they represent market rent.  Thus, the court finds that comparable leases 6, 7, 8, 9, and 10 adequately represent the sector of mid-sized retail tenants in a community shopping center.  However, the court finds that Green Eagle's expert's -5%

---

[13] Comparable lease 6 and comparable lease 7 are the subject property's Marshalls lease and Party City lease.






location adjustment to comparable leases 8, 9, and 10 was unsupported by adequate evidence in the record.[14] Accordingly, the adjusted rental range for Green Eagle's expert's comparable leases is $9.00 to $12.46, per square foot, with a mean of $10.69.

The court's review of Mansfield's expert's four comparable leases discloses three are not located in community shopping centers and thus, are of dubious usefulness to the court. Comparable lease 3 is not located in a community shopping center but rather is a single-tenanted, stand-alone building. Comparable lease 3 is a 23,000 square foot retail store located on Route 10 in East Hanover, Morris County, New Jersey. As comparable lease 3 is not located in a community shopping center and is a stand-alone building, the tenant is not benefitted from having a larger anchor tenant adjacent to it and attracting potential business to its store. Thus, the rent negotiated by the tenant reflects the lack of a synergistic benefit that Mansfield's expert opined exists in the subject property's community shopping center between the Walmart, Kohl's, and the mid-size and in-line tenants.

Comparable lease 4 is a 55,398 square foot furniture store,[15] in a two-tenant building located on Route 46 in Totowa, Passaic County, New Jersey. Thus, comparable lease 4 is also not located in a community shopping center. The other tenant in comparable lease 4's building occupies approximately 150,000 square feet and operates a tire distributorship. Importantly, Mansfield's expert did not possess, or review the lease agreement, or sublease agreement, for comparable lease 4. The only alleged confirmation of comparable lease 4's lease terms was Mansfield's expert's review of a rent roll furnished by another appraiser. Mansfield's expert did

---

[14] Green Eagle's expert offered only that his location adjustments were based on his analysis of NJDOT traffic counts.

[15] A portion of the furniture store is retail space, a portion is mezzanine space, and a portion is warehouse space.






not know who prepared the rent roll or who produced the rent roll to the other appraiser. Mansfield's expert did not speak with any representatives of the landlord or tenant, nor the real estate brokers or attorneys involved in the lease or sublease transaction to verify their authenticity. The court finds Mansfield's expert's reliance on a rent roll, without having reviewed the lease, sublease, or lease abstract and without verifying the pivotal lease terms with any individual having personal knowledge of the lease transaction renders comparable lease 4 inherently unreliable.

Therefore, for the above stated reasons, the court does not find that Mansfield's expert's comparable leases 3 and 4 are reliable evidence of market rent and accurately reflect the economic rent that would be negotiated by a junior anchor or mid-size tenant in a community shopping center.

Additionally, Mansfield's expert's comparable lease 1 is situated in a three-retail store outbuilding adjacent to the Rockaway Townsquare Mall and not in a community shopping center. Mansfield's expert testified that comparable lease 1 was representative of a junior anchor or mid-sized retail store, as it comprises approximately 27,459 square feet. However, Mansfield's expert failed to furnish the court with the total square footage of the retail outbuilding area. Therefore, the court could not discern the size of the retail center where comparable lease 1 was located and how that square footage percentage may have contributed to its ability to negotiate rent. More importantly, the court questions the impact and significance that comparable lease 1's location, as part of the Rockaway Townsquare Mall complex, had in determining the rent. Accordingly, while the court does not exclude Mansfield's expert's comparable lease 1, the court attributes little weight to it in discerning the economic or market rent of the junior anchor or mid-size tenant retail units.






Accordingly, analyzing Green Eagle's expert's comparable leases 6, 7, 8, 9, and 10 and Mansfield's expert's comparable leases 1 and 2 discloses the following range of adjusted rents for the junior anchor or mid-size tenants: $9.00, $10.00, $12.00, $12.46, $14.70, and $16.83. The median is $12.23 per square foot, and the mean is $12.50 per square foot. After analyzing the foregoing comparable leases, the court attributes the greatest weight to Green Eagle's expert's comparable lease 6 ($10.00 psf) and comparable lease 7 ($12.46 psf), which are the subject property's Marshall's lease and Party City leases; Green Eagle's expert's comparable lease 9 ($10.00 psf), located in Pohatcong, and Mansfield's expert's comparable lease 2 ($16.83 psf), located in Randolph. Accordingly, the court concludes an economic or market rent of $12.30, per square foot, should be attributed to the 36,674 square feet of junior anchor and mid-size retail area in the subject property's shopping center, as of the October 1, 2013, October 1, 2014, October 1, 2015, October 1, 2016, and October 1, 2017 valuation dates.[16]

### c. In-line

The in-line tenants occupy approximately 23,023 square feet of the subject property's retail area, comprising approximately 8.5% of the center.

The court's review of Green Eagle's expert's comparable leases 11, 12, and 13, and Mansfield's expert's comparable leases 5, and 6, discloses that each of the leases are in a shopping center immediately adjacent to the subject property's shopping center along Route 57. Green Eagle's expert's comparable lease 9 and Mansfield's comparable lease 6 appear as the same leased

---

[16] The court declined to attribute greater weight to Green Eagle's expert's comparable lease 6, the subject property's Marshall's lease. During trial, Mr. Orrico provided credible testimony that prior to Marshalls agreeing to take occupancy of this space, it sat vacate for 4 years.






premises.[17]   Moreover, Green Eagle's expert's comparable leases 11, 12, and 13 were executed between December 2013 and November 2014, and Mansfield's expert's comparable leases 5 and 6 were executed between August 2012 and April 2015.  Therefore, the foregoing five leases were executed within the valuation periods involved in these local property tax appeals.  Accordingly, the court finds that the foregoing leases accurately represent comparable in-line retail stores in the Mansfield Township marketplace.

However, the court does not find Mansfield's expert's comparable leases 7, 8, 9, and 10comparable to the subject property's in-line stores, and thus, representative of the economic rent for the subject property's in-line retail stores.  Mansfield's expert's comparable lease 7 is a Starbucks with a drive-up window and an exterior patio area included in the retail leasable area.  None of the subject property's in-line tenancies have a drive-up window, and Mansfield's expert offered no evidence that a drive-up window could be constructed for any of the subject property's in-line tenancies.[18]   Moreover, Mansfield's expert did not offer any evidence that the subject property's in-line stores include or can accommodate an exterior patio area.  Additionally, the lease affords Starbucks construction allowances totaling approximately $94,100.  Although Mansfield's expert submitted that he believed these allowances were furnished to address structural issues and were not part of a tenant improvement allowance, he did not confer with any of the lease transaction participants to verify his beliefs regarding the construction allowances and offered no basis of support for his beliefs.  Moreover, during cross-examination, Mansfield's expert offered

---

[17]  Although both Green Eagle's expert and Mansfield's expert identify the average rent for the leased comparable as $20.40 per square foot, they recite different lease commencement dates.
[18]  Mansfield's expert stated that the Starbucks was an end-cap unit with a drive-up window and the subject property has an end-cap unit that was formerly occupied as a restaurant, but the subject property's end-cap unit does not have a drive-up window.






that Starbucks used part of the allowance to install the drive-up window, drive-up lanes, parking area, and parking spaces. Thus, the court is unsure whether all or only a portion of the $94,100 allowance was used by Starbucks as a tenant improvement allowance, and more importantly, whether that allowance influenced the rent payable under the lease.

Additionally, Mansfield's expert's comparable leases 8 and 9 are situated in a retail outbuilding immediately adjacent to the Rockaway Townsquare Mall complex and are not located in a community shopping center. According to Mansfield's expert, leases 8 and 9 represent the market rent for in-line retail stores. However, the court questions the impact their location in the Rockaway Townsquare Mall complex had in determining the rent for comparable leases 8 and 9. Being located in the Rockaway Townsquare Mall complex likely impacted the in-line rents charged for comparable leases 8 and 9. Therefore, the court does not find them to be comparable to the subject property's in-line leases.

Finally, Mansfield's expert's comparable lease 10 was apparently a "turnkey" lease arrangement. Generally, under a turnkey lease the landlord assumes responsibility for all required demolition and construction to the leased area. The tenant need only turn the key and unlock the doors to commence business operations. During cross-examination, Mansfield's expert acknowledged that under the "landlord's work" section of comparable lease 10, it states that the landlord will remove the existing improvements and satisfy the tenant "requirements" for "the construction of a turnkey store." Mansfield's expert posited that despite this provision appearing under the "landlord's work" section of the lease because it did not expressly state who paid for the "turnkey" demolition and construction, he assumed that the tenant paid the landlord for those costs. According to Mansfield's expert, "I am certain that there is a rider and reconciliation that was not provided to me in discovery which comes later, after the lease was done" that memorialized who






was responsible for the costs of construction. However, Mansfield's expert offered no evidence to support this conclusion. Thus, the court finds Mansfield's expert's statements in that regard to amount to little more than speculation and supposition. Mansfield's expert possessed no knowledge or information who paid for the "turnkey" demolition and renovation, whether the landlord or tenant incurred the costs, or whether the costs associated with the demolition and construction were amortized over the lease term and calculated into the monthly rental obligation. Therefore, the court does not find Mansfield's expert's comparable lease 10 to be credible evidence of economic rent for the subject property's in-line retail stores.

Accordingly, analyzing Green Eagle's expert's comparable leases 11, 12, and 13, and Mansfield's expert's comparable leases 5, and 6, discloses the following range of adjusted rents for in-line tenants: $14.85, $17.65, $20.40, $20.40, and $23.54. The median is $20.40 per square foot, and the mean is $19.37 per square foot. After evaluating the foregoing comparable leases, the court concludes an economic or market rent of $20.40, per square foot, should be attributed to the 23,023 square feet of in-line retail area in the subject property's shopping center, as of the October 1, 2013, October 1, 2014, October 1, 2015, October 1, 2016, and October 1, 2017 valuation dates.

       d.    Vacancy and collection loss

According to Green Eagle's expert, the alleged "superadequacy" of Building One was a factor he considered in arriving at a vacancy and collection loss. In Green Eagle's expert's opinion, Building One suffers from functional obsolescence because Walmart and Target, the "leaders in the commercial shopping center world are looking at stores of the future between 45,000 to 75,000± square feet." This "revolution" will cause "commercial establishments [such] as Walmart and Target . . . [to] not long be constructing the prior building model of the big box with . . . a store






between 100,000 to 200,000± square feet." In Green Eagle's expert's estimation, as of each valuation date at issue, a "more utopian" or "favorably sized" 75,000 square foot building would have been constructed in place of the "larger, functionally obsolete," 123,519 square foot, Building One. In his opinion, Building One possesses a layout and design representing "something of the past, not a current, in demand, kind of a building."[19]

In addition to considering the alleged superadequacy of Building One, Green Eagle's expert examined the subject property's current and historical vacancy rates, along with published articles addressing the "future of brick-and-mortar retail stores," and 3rd/4th quarter 2015 Brunelli studies on retail vacancy rates in New Jersey. The Brunelli studies revealed that retail stores' vacancy rates in northern New Jersey counties were at 7.9% in 2015. Based on Green Eagle's expert's review of the subject property's vacancies during the tax years at issue, he found that the anchor stores have been 100% occupied, while the mid-sized stores were 50% vacant until 2015, and the smaller in-line stores were approximately 36% vacant. After considering the articles, published data, and alleged superadequacy of Building One, Green Eagle's expert opined that a vacancy and collection loss factor of 7.5% should be applied to the subject property as of each valuation date.

For reasons later expressed in this opinion, the court does not find credible Green Eagle's expert's testimony that Building One suffers from any superadequacy. Thus, the court finds that consideration of Building One's alleged superadequacy in calculating the subject property's

---

[19] In support of these contentions, Green Eagle's expert's report's Addendum contained two articles, one from Investopedia's website titled "The Future of Retail Is Not Big Box Stores," dated December 17, 2015 and the other from Retail Dive's website titled "What is the future of brick-and-mortar retail stores?" dated April 13, 2015.






vacancy and collection loss factors would artificially inflate those rates.

Similarly, Mansfield's expert apparently conducted a review of the subject property's current and historical vacancy rates. In addition, he generated a CoStar report containing the vacancy rates of retail buildings located within a 1-mile radius of the subject property.[20] The CoStar report apparently examined approximately 779,429 square feet of retail space, detailing vacancy rates of: (i) 7.4% for 3rd quarter 2013; (ii) 5.8% for the 3rd quarter 2014; (iii) 4.2% for the 3rd quarter 2015; (iv) 4.5% for the 3rd quarter 2016; (v) 5.6% for the 3rd quarter 2017. After reviewing the foregoing information, Mansfield's expert concluded a vacancy and collection loss factor of 5%. However, the CoStar report is not annexed to Mansfield's expert's appraisal report. Thus, the court is unsure of the type or quality of the retail buildings included in that report. For instance, the court does not know how many community shopping centers are included in the report and whether the report is predominantly composed of owner-occupied stand-alone retail buildings or small in-line strip shopping centers.

After having considered the experts' testimony and reviewing the above information, the court finds that a vacancy and collection loss factor of 5.5% should be applied to the subject property as of October 1, 2013, October 1, 2014, October 1, 2015, October 1, 2016, and October 1, 2017 valuation dates.

e.    Stabilization

Once economic or market rent and the vacancy and collection loss to be applied has been determined, the appraiser must discern the stabilized expenses to be applied to the Effective Gross Income. Stabilization "involves elimination of abnormalities or any additional transitory

---

[20] Mansfield's expert failed to include a copy of the CoStar vacancy report in his appraisal report. Thus, the court was unable to review the data generating the proposed vacancy rates.






conditions from stated income or expenses to reflect conditions that are expected to continue over the economic life of the property." First Republic Corp. of America, 16 N.J. Tax at 579 (Tax 1997) (citing The Dictionary of Real Estate Appraisal, 344-45 (3rd ed. 1993)). Consistent with that principle, under the income capitalization approach, the appraiser must perform a "comprehensive analysis of the annual expenses" and income of the property being appraised. The Appraisal of Real Estate, at 453. As part of that analysis the appraiser will prepare a reconstructed operating statement to "reflect the potential future performance of a property, considering the historical income and expenses of an investment property." Ibid. See also Parkway Village Apartments Co., 8 N.J. Tax at 444 (concluding that "[i]t is clear that an appraiser's function is to reconstruct a yearly pattern of expenses . . . Expenses vary from year to year, and it is important to review operating statements for three or more years in order to determine whether certain expenses are typical or atypical."). It is through the examination and analysis of the property's historical income and expense data, when measured against comparable properties in the market, that an appraiser is able to discern the potential future performance of the property over its economic life.

However, no static rule can be applied when determining whether certain conditions will persist over a property's economic life. An appraiser must consider each project on a case-by-case basis and analyze the property's historical income and expenses against marketplace norms. When evidence discloses that a property's actual expenses are outside acceptable norms, an adjustment must be fashioned to fit the "well-managed" standard. Equitable Life Assur. Soc'y of U.S. v. Secaucus Twp., 16 N.J. Tax 463, 467 (App. Div. 1996). Therefore, in fashioning a reconstructed operating statement, an appraiser should rely on marketplace norms and those income and expenses that the evidence dictates will reasonably continue over a property's economic life, and






reject those that may be irregular, erratic, uncharacteristic, and not typical in the industry.

### 1. Tenant improvement/fit-up allowances

In "certain real estate markets, space is rented to a new tenant only after substantial interior improvements are made." Hull Junction Holding Corp., 16 N.J. Tax at 106 (quoting Appraisal Institute, The Appraisal of Real Estate, 450 (10th ed. 1992)). When these improvements are incurred at the landlord's expense and are necessary to realize market rent, they are referred to as tenant improvement/fit-up allowances. The cost of these allowances are often built into the rental rate and amortized by the landlord over the lease term. The Appraisal of Real Estate, at 474.

Here, both experts agreed that tenant improvement/fit-up allowances were customary for community shopping centers and retail stores in the subject property's market area; however, the experts disagreed on the amount of those allowances. In Green Eagle's expert's opinion, the tenant improvement/fit-up allowance should be $0.75 per square foot of building area; and in Mansfield's expert's opinion, the tenant improvement/fit-up allowance should be $1.50 per square foot of building area. Importantly, however, in calculating the tenant improvement/fit-up allowance, Green Eagle's expert applied his $0.75 per square foot allowance to the subject property's 272,046 square feet gross retail area. In sharp contrast, Mansfield's expert applied his $1.50 per square foot tenant improvement/fit-up allowance to 148,527 square feet.[21]

Unfortunately, the experts provided little market data and surveys supporting their tenant improvement/fit-up allowance calculations. Mr. Orrico presented the most credible evidence

---

[21] Mansfield's expert's appraisal report applied the tenant improvement/fit-up allowance to 148,460 square feet. However, as stipulated by Green Eagle and Mansfield at the beginning of trial, the subject property comprises a total of 272,046 square feet of leasable area, and the Walmart occupying Building One comprises 123,519 square feet. Thus, based on the parties' stipulation, Building Two comprises 148,527 square feet (272,046 – 123,519 = 148,527).






during trial regarding tenant improvement/fit-up allowances. According to Mr. Orrico, National Realty divided and renovated the former Walmart store in the Pohatcong community shopping center, consisting of approximately 133,000 square feet, to create two separate retail stores, one for Hobby Lobby (56,330 square feet), and the other for Marshalls (net of 42,000 square feet after demolition of approximately 35,000 square feet). The costs borne by National Realty to fit-up the Hobby Lobby store were approximately $280,000 or $4.97 per square foot ($280,000 / 56,330 square feet = $4.97). Conversely, the costs borne by National Realty to fit-up the Marshalls store were significantly more, approximately $2,800,000 or $36.36 per square foot ($2,800,000 / 77,000 square feet = $36.36). Mr. Orrico explained that the costs to fit-up the Marshalls were much higher because they wanted National Realty to demolish approximately 35,000 square feet of the former store and furnish them with a turn-key store. Thus, National Realty had to undertake a greater scope of work. However, because National Realty had to incur additional renovation costs, the rent attributable to the Marshalls store was approximately $5.00 per square foot more than the rent attributable to the Hobby Lobby store for similar lease terms.

Accepting a ten-year useful life as proffered by Mansfield's expert, the annual expense incurred by National Realty to fit-up the Hobby Lobby retail store was approximately $0.497 per square foot. Conversely, the annual expense incurred by National Realty to fit-up the Marshalls retail store was approximately $3.36 per square foot.

Accordingly, considering the experts' testimony and the above information, the court finds that Green Eagle's expert's proposed annual tenant improvement/fit-up allowance of $0.75 per square foot is reasonable in the Warren County community shopping center market. However, because Walmart leases the land where Building One is located and owns the building and improvements, not Green Eagle, the annual tenant improvement/fit-up allowance should be






applied only to the 148,527 square feet of retail area Green Eagle owns (Building Two and the restaurant pad site). Therefore, the court will apply a $0.75 per square foot tenant improvement/fit-up allowance to the subject property's 148,527 square feet of Building Two and restaurant pad site.

### 2. Operating expenses and reserves

Both experts reached similar conclusions with respect to the stabilized operating expenses (management fees, real estate commissions, and structural reserves) that should be applied to the subject property's Effective Gross Income.

Green Eagle's expert reasoned that management fees in community shopping centers like the subject property range from 3% to 5% of Effective Gross Income. Green Eagle's expert compared management fees paid by National Realty in thirteen community shopping centers in New Jersey, finding that the "average management fee [is] . . . 3.66%" and rounding his concluded management fee to 4.0%. Conversely, Mansfield's expert explained that management fees in community shopping centers, range from 3% to 7% of Effective Gross Income, "selecting a percentage in the middle of the range" at 3.50%.

Similarly, Green Eagle's expert expressed that leasing commissions for community shopping centers historically range from 3% to 6%. Green Eagle's expert compared real estate commissions paid by National Realty in thirty-three lease transactions involving community shopping centers throughout New Jersey, finding that the "average is 3.41%" and rounding his concluded value to 3.50%. Conversely, Mansfield's expert surveyed local commercial real estate brokers, finding that commissions should be estimated at 5% of the aggregate rent. Thus, Mansfield's expert opined that a leasing commission expense of 2.5% should be applied.

Finally, based on his review of market data, Green Eagle's expert opined that a reserve






allowance of 2.0% should be applied for anticipated structural repairs to the subject property. Conversely, Mansfield's expert analyzed investor surveys for strip shopping centers and determined that anticipated replacement reserves range from $0.10 to $0.50 per square foot, concluding a $0.35 value per square foot value. Applying the $0.35 value to the subject property's 145,627 square feet attributable to Building Two and the restaurant pad site resulted in a reserve allowance of approximately 2.07% of Effective Gross Income.

Although the court finds both experts stabilized operating expenses to be reasonable and similar, the court finds the empirical data relied upon by Green Eagle's expert in discerning his stabilized operating expenses to be more credible, and reliable evidence of stabilized expenses for a community shopping center. Therefore, the court will apply a management fee of 4.0%, leasing commissions of 3.50%, and a reserve allowance of 2.0% of Effective Gross Income. However, as stated above, because Walmart's occupy of Building One is a ground lease, and Walmart is responsible for all structural repairs to its building, the court will apply the structural reserve component of the stabilized operating expenses only to the 148,527 square feet comprising Building Two and the restaurant pad site.

### 3. Capitalization

The direct capitalization technique is used "to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." The Appraisal of Real Estate, at 491; Hull Junction Holding Corp., 16 N.J. Tax at 80-81. Thus, the capitalization rate is the device that converts a property's Net Operating Income into an estimate of value.






Here, in deriving their capitalization rates, Green Eagle's expert and Mansfield's expert undertook a review of published data, including investor surveys, and employed the Band of Investment technique.[22] The Band of Investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Hull Junction Holding Corp., 16 N.J. Tax. at 80-81 (quoting Appraisal Institute, The Appraisal of Real Estate, 467 (10th ed 1992)). When employing the "Band of Investment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing 'reliable market data . . . to the court as the basis for the expert's opinion so that the court may evaluate the opinion.'" Id. at 82 (quoting Glen Wall Assocs., 99 N.J. 265, 279-80 (1985)).

Both Green Eagle's expert and Mansfield's expert consulted the American Council of Life Insurers ("ACLI") Investment Bulletins for their capitalization rates. Green Eagle's expert consulted the ACLI tables containing Commercial Mortgage Commitments – Fixed Rate Mortgages – Retail properties, loans in excess of $25 Million, for the 3rd and 4th Quarters 2013-2017. Mansfield's expert consulted the ACLI tables containing Commercial Mortgage Commitments – Fixed Rate Mortgage - Retail properties, for the 3rd Quarter 2012-2013. In addition, Mansfield's expert consulted the ACLI tables containing Commercial Mortgage

---

[22] "[T]he Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance." Hull Junction Holding Corp., 16 N.J. Tax at 82-83. "Relevant data is also collected and published by . . . Korpacz [PWC] Real Estate Investor Survey." Id. at 83. By scrutinizing and "analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Ibid.






Commitments – All Loans category - Retail properties – all loan amounts, for the 3rd Quarter 2014-2017.

In addition, both experts consulted Korpacz/PWC National Strip Shopping Center Market surveys ("Korpacz") for their capitalization rates. Green Eagle's expert relied on the 3rd and 4th Quarters 2013-2017 Korpacz surveys, and Mansfield's expert relied on the 3rd Quarter 2013-2017 Korpacz surveys.

Green Eagle's expert also consulted Real Estate Research Corporation publications, 2nd tier properties, within the Retail/Neighborhood Commercial property category, for the 3rd and 4th Quarters 2013 – 2017 ("RERC") for their capitalization rates.

Mansfield's expert also consulted RealtyRates.com surveys, retail properties, for the 4th Quarter 2012 – 2017 ("RealtyRates") for capitalization rates.

After reviewing that data and information, Green Eagle's expert concluded the following capitalization rates: (i) 7.82%, as of October 1, 2013; (ii) 7.72%, as of October 1, 2014; (iii) 7.72%, as of October 1, 2015; (iv) 7.72%, as of October 1, 2016; and (v) 7.72%, as of October 1, 2017. Conversely, Mansfield's expert concluded the following capitalization rates: (i) 6.69%, as of October 1, 2013; (ii) 6.69%, as of October 1, 2014; (iii) 6.69%, as of October 1, 2015; (iv) 6.69%, as of October 1, 2016; and (v) 6.69%, as of October 1, 2017.

The court's own review and analysis of the information disclosed that: (i) as of the October 1, 2013 valuation date, retail property interest rates were 4.20% to 4.35%, loan-to-value ratios were 60.69% to 60.76%, and mortgage constants were 5.52% to 5.99%; (ii) as of the October 1, 2014 valuation date, retail property interest rates were 3.93% to 4.15%, loan-to-value ratios of 59.35% to 61.29%, and mortgage constants were 5.47% to 6.19%; (iii) as of the October 1, 2015 valuation date, retail property interest rates were 3.89% to 4.31%, loan-to-value ratios of 58.53%






to 61.17%, and mortgage constants were 5.23% to 5.71%; (iv) as of the October 1, 2016 valuation date, retail property interest rates were 3.50% to 3.94%, loan-to-value ratios were 52.85% to 58.25%, and mortgage constants were 4.66% to 5.39%; and (v) as of the October 1, 2017 valuation date, retail property interest rates were 3.67% to 4.56%, loan-to-value ratios were 55.97% to 58.25%, and mortgage constants were 4.58% to 5.35%.

Thus, based on a review of the above data and information, the court concludes that under the Band of Investment technique: (i) as of the October 1, 2013 valuation date, Mansfield's expert's mortgage interest rate of 4.50% is more reasonable, a 25-year amortization term is more reasonable and will produce a mortgage constant in line with the published data, a 65% loan-to-value ratio should be applied, and Green Eagle's expert's equity dividend rate of 8.00%, is more reasonable; (ii) as of the October 1, 2014, October 1, 2015, October 1, 2016, and October 1, 2017 valuation dates, Green Eagle's and Mansfield's expert's mortgage interest rates of 4.50% are reasonable, a 25-year amortization term is more reasonable and will produce a mortgage constant in line with the published data, a 65% loan-to-value ratio should be applied, and Green Eagle's expert's equity dividend rate of 8.00%, is more reasonable.

Thus, using the Band of Investment technique, the calculation of the capitalization rate as of the October 1, 2013, October 1, 2014, October 1, 2015, October 1, 2016, and October 1, 2017 valuation dates would be:

| | | | | | |
|---|---|---|---|---|---|
| Mortgage interest rate | 4.50% | | | | |
| Amortization period | 25 years | | | | |
| Mortgage constant | 6.67 | | | | |
| Mortgage component | 65% | x | 6.67 | = | 4.34 [ROUNDED] |
| Equity divided rate | 8.00% | | | | |
| Equity component | 35% | x | 8.00 | = | 2.80 |
| | | | | | 7.14 |






Thus, the court concludes that a 7.14% capitalization rate should apply to the subject property as of the October 1, 2013, October 1, 2014, October 1, 2015, October 1, 2016, and October 1, 2017 valuation dates.

Accordingly, for the reasons set forth above, the court finds the true value of the subject property, under the income-capitalization approach, to be $32,100,000, as of the October 1, 2013, October 1, 2014, October 1, 2015, October 1, 2016, and October 1, 2017 valuation dates.

**2014, 2015, 2016, 2017, and 2018 Tax Years**

INCOME:

| | | | |
|---|---|---|---|
| Anchor tenants | $ 8.90 psf | @ 212,349 sq. ft. | $1,889,906 |
| Mid-size tenants | $12.30 psf | @ 36,674 sq. ft. | $ 451,090 |
| In-line tenants | $20.40 psf | @ 23,023 sq. ft. | $ 469,669 |
| TOTAL: | POTENTIAL GROSS INCOME | | $2,810,665 |

| | | |
|---|---|---|
| LESS: Vacancy & Collection Loss | @ 5.50% PGI | ($ 154,587) |
| TOTAL: | EFFECTIVE GROSS INCOME | $2,656,078 |

STABILIZED EXPENSES:

| | | | |
|---|---|---|---|
| Leasing Commissions | @ 3.5% of EGI | $ 92,963 | |
| Management | @ 4.0% of EGI | $106,243 | |
| Repairs/Replacement Reserves | @ 2.0% of EGI | $ 53,122 | |
| Tenant Improvements 148,527 sq. ft. @ $0.75 psf | | $111,395 | |
| TOTAL: EXPENSES | | ($363,723) | |

NET OPERATING INCOME $ 2,292,355

TOTAL CAPITALIZATION RATE 7.14%

APPLICATION OF CAPITALIZATION RATE $2,292,355/.0714 = $32,105,812

CONCLUDED VALUE $32,100,000

   2.   Cost Approach

The cost approach derives a property's value "by adding the estimated value of the land to the current costs of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation (i.e., deterioration and obsolescence) in the structures from






all causes." The Appraisal of Real Estate, at 47. Thus, the cost approach consists of "two elements - land value and the reproduction or replacement cost of the buildings and other improvements." International Flavors & Fragrances, Inc. v. Union Beach Bor., 21 N.J. Tax 403, 417 (Tax 2004).

The cost approach is a particularly effective method of valuation when the property being appraised is new or when the site improvements are unique and designed for a special purpose. The Appraisal of Real Estate, at 567-568. A special purpose property is the type of property that "'cannot be converted to other uses without large capital investment,' such as a public museum, a church, or a highly-specialized production facility like a brewery." Ford Motor Co., 127 N.J. at 299 (quoting Sunshine Biscuits, Inc. v. Sayreville Bor., 4 N.J. Tax at 495 n. 3 (Tax 1982)).

However, when site improvements are "considerably older or do not represent the highest and best use of the land as though vacant, the physical deterioration, functional obsolescence, and external obsolescence may be more difficult to estimate," rendering the cost approach a less reliable indicator of market value. The Appraisal of Real Estate, at 567-568. Thus, the cost approach can sometimes be impractical in attempting to value properties with "older improvements that suffer substantial depreciation, which can be difficult to estimate." Id. at 45.

During trial, Green Eagle and Mansfield stipulated that the reproduction cost new of Building One (inclusive of an entrepreneurial profit of 10%), was: (i) $11,285,446, as of October 1, 2013; (ii) $11,723,024, as of October 1, 2014; (iii) $11,905,525, as of October 1, 2015; (iv) $12,173,065, as of October 1, 2016; and (v) $12,476,808, as of October 1, 2017. In addition, Green Eagle and Mansfield further stipulated that a 15% depreciation factor should be applied to Building One. Finally, the parties agreed that the value attributable to Building One's parking






spaces was $1,492, per parking space.[23] Thus, after deducting the stipulated 15% depreciation factor, and the value of the 615 surface parking spaces (615 x $1,492 = $917,580), the total depreciated value of Building One and its improvements are: (i) $10,510,209 ($11,285,446 - $1,692,817 + $917,580 = $10,510,209), as of October 1, 2013; (ii) $10,882,150 ($11,723,024 - $1,758,454 + $917,580 = $10,882,150), as of October 1, 2014; (iii) $11,037,276 ($11,905,525 - $1,785,829 + $917,580 = $11,037,276), as of October 1, 2015; (iv) $11,264,685 ($12,173,065 - $1,825,960 + $917,580 = $11,264,685), as of October 1, 2016; (v) $11,522,867 ($12,476,808 - $1,871,521 + $917,580 = $11,476,808), as of October 1, 2017.

Both experts employed a hybrid approach to value the subject property. Mansfield's expert's hybrid methodology employs the cost approach, sales comparison approach, and income capitalization approach to determine a value for the subject property. Conversely, Green Eagle's expert's hybrid approach involves only the cost approach and income capitalization approach.

To ascertain the estimated true value of the land beneath Building One, Mansfield's expert researched vacant land sales to discern a per unit value. He then multiplied the approximately 123,519 square feet of land beneath Building One by his per unit value, to derive an estimated value. Mansfield's expert then added the value he ascribed to the land beneath Building One, to

---

[23] As stated above, Green Eagle and Mansfield initially agreeing that the value of the 800 surface parking spaces allocated to Building One was $1,193,600, or $1,492 per parking space. Subsequently, Green Eagle and Mansfield amended their stipulation to reflect that only 615 parking spaces were allocated to Building One. However, they did not submit to the court a revised calculation of the value of the 615 surface parking spaces. Accordingly, following trial, the court inquired whether Green Eagle and Mansfield agreed to the reduced stipulated value of the 615 surface parking spaces allocated to Building One, $917,580 (615 x $1,492 per parking space = $917,580), versus the $1,193,600 (800 x $1,492 per parking space = $1,193,600) initial stipulation. Green Eagle submitted that "it is within the court's determination whether to calculate such change." Conversely, Mansfield submitted that "no further calculation is required."






the value he determined for Building Two and the restaurant pad site under the income capitalization approach, plus the stipulated reproduction cost new of Building One (less depreciation, plus surface parking spaces), to ascribe a value to the subject property.

In performing his hybrid approach, Green Eagle's expert applied a 20% deduction for functional obsolescence to the stipulated reproduction cost new of Building One. To that value, Green Eagle's expert added the estimated value of the 615 surface parking spaces. Next, Green Eagle's expert used the income capitalization approach to compute a value for Building Two and the restaurant pad site. Green Eagle's expert then added the value of Building Two and the restaurant pad site to the value of Building One (less depreciation, less functional obsolescence, plus surface parking spaces) to discern a value for the subject property. Thus, Green Eagle's expert did not attribute any independent value to the land beneath Building One; rather, he opined that the value of the subject property's land was included under his income capitalization approach.

Here, the land underlying Building One is subject to a ground lease. Thus, the lessee (Walmart) leased the land from the property owner (Green Eagle), constructed improvements on that land (Building One), and is solely responsible for any maintenance and structural repairs to the building. Moreover, Mr. Orrico offered credible testimony that, during the term of the ground lease, the lessee (Walmart) can demolish all or so much of the building as it may elect, and upon expiration of the ground lease, the improvements remaining, if any, vest with the property owner (Green Eagle). For the reasons that follow, the court finds the hybrid approach employed by Green Eagle's expert and Mansfield's expert are not reliable indicators of true value and possess inherent difficulties in discerning the true value of this aging community shopping center, that is neither uniquely designed, nor a special-purpose structure. Attempting to derive a value for the land beneath Building One, including the range of adjustments necessary to Mansfield's expert's vacant






land sales to accurately account for the differences that exist, renders the hybrid approach employed by Mansfield's expert more speculative and not a credible indicator of the subject property's true value. Additionally, Green Eagle's expert's failure, under his hybrid approach, to consider or analyze the land beneath Building One as excess land available for development in deriving a value for the subject property renders his hybrid approach to value not a credible indicator of the subject property's true value.

A.    Functional obsolescence

Although Green Eagle and Mansfield agreed on the replacement cost new of Building One and the application of a 15% deduction for physical depreciation, the experts disagreed whether Building One suffers from functional obsolescence.

Functional obsolescence is characterized as "a flaw in the structure, materials, or design of the improvement when compared with the highest and best use and most cost-effective functional design requirements at the time of the appraisal . . . Functional obsolescence, which may be curable or incurable, can be caused by a deficiency, which means that some aspect of the subject property is below standard in respect to market norms." Westwood Lanes, Inc. v. Garwood Bor., 24 N.J. Tax 239, 262 (Tax 2008) (quoting The Appraisal Institute, The Appraisal of Real Estate, 403 (12th ed. 2001). "The test of curability for functional obsolescence caused by a deficiency is whether the cost to cure the item will result in a value increment equal to or greater than the expenditure, or allow existing items to maintain their value, then the item is considered curable. Otherwise, if the cost to cure the item will not result in a value increment greater than the loss in value caused by the item or building component, then the item is considered incurable." Regent Care v. Hackensack City, 27 N.J. Tax 138, 155 (Tax 2013) (citing The Appraisal of Real






Estate, at 434).

Here, Green Eagle's expert maintains that Building One suffers from functional obsolescence because Walmart and Target, the "leaders in the commercial shopping center world, are looking at stores of the future between 45,000 to 75,000± square feet." This "revolution" will cause "commercial establishments [such] as Walmart and Target . . . [to] not long be constructing the prior building model of the big box with . . . a store between 100,000 to 200,000± square feet." In Green Eagle's expert's estimation, as of each valuation date at issue, a "more utopian" or "favorably sized" 75,000 square foot building would have been constructed in place of the "larger, functionally obsolete," 123,519 square foot, Building One. In his opinion, Building One possesses a layout and design representing "something of the past, not a current, in demand, kind of a building."

Accordingly, in gauging Building One's alleged functional obsolescence, Green Eagle's expert compared the cost of constructing a new, 75,000 square foot building to the cost of constructing a new Building One and determined that the difference in cost was 22%.[24] Accordingly, Green Eagle's expert applied a -20% functional obsolescence factor to Building One's cost to construct new, in addition to the -15% physical depreciation factor.[25] Thus, as of each valuation date at issue, Green Eagle's expert concluded a value for Building One, as follows: (i) $8,529,000, as of October 1, 2013; (ii) $8,814,000, as of October 1, 2014; (iii) $8,932,000, as of October 1, 2015; (iv) $9,106,000, as of October 1, 2016; and (v) $9,304,000, as of October 1,

---

[24] Green Eagle's expert estimated the cost to construct new, a 75,000 square foot building was $9,264,000 and the cost to construct new, Building One, was $11,906,000 ($9,264,000/$11,906,000 = 22.19%)

[25] Green Eagle's expert further testified that he considered the costs incurred by National Realty in subdividing and demolishing a part of the former Walmart space in the Pohatcong shopping center to fit it up for new tenants.





2017.[26]

Conversely, Mansfield's expert found that Building One suffers from no functional obsolescence. Mansfield maintains that the trial testimony disclosed that stores like Walmart are occupying larger footprints and building "Super Stores," not smaller stores. Mansfield highlights that the evidence disclosed that in National Realty's Manville community shopping center, Walmart expanded its existing footprint by 31,162 square feet to a total area of 164,387 square feet. Additionally, Mansfield emphasizes that Walmart vacated its smaller retail store in National Realty's Pohatcong, Warren County, community shopping center in favor of a larger 165,000 square foot facility immediately adjacent thereto. Moreover, effective cross-examination disclosed that Green Eagle's expert conducted no investigation whether Building One could be expanded to accommodate a Walmart "Super Store," nor did he know whether Walmart has constructed any retail stores in New Jersey less than 100,000 square feet.[27]

Contrary to the opinions and assertions of Green Eagle's expert, the court finds that based on the limited evidence offered during trial, in National Realty's New Jersey community shopping centers, Walmart has opted to possess 160,000 to 190,000 square feet stores, not smaller 75,000 square foot stores. In addition, Mr. Orrico offered credible testimony that, based on his leasing and development experience, stores such as Walmart are seeking to attract more customers to their stores. Thus, more customers are attracted to Walmart's stores offering a grocery component and

---

[26] These concluded values assumed that 800 surface parking spaces (800 x $1,492, per parking space = $1,193,600) were allocated to Building One. However, during trial the parties stipulated that 615 surface parking spaces (615 x $1,492, per parking space = $917,580).

[27] In discussions between Mr. Orrico and Green Eagle's expert, Mr. Orrico apparently averred to Walmart having constructed two stores in New Jersey comprising less than 100,000 square feet. However, Green Eagle's expert was unaware of the locations of those establishments nor the circumstances surrounding their construction.






that occupy a larger footprint. In sum, Green Eagle has not presented any credible evidence that "commercial establishments as Walmart and Target . . . will not long be constructing the prior building model of the big box store with . . .between 100,000 to 200,000± square feet."

Accordingly, the court finds that Green Eagle's expert's -20% functional obsolescence deduction attributable to Building One is unwarranted.

B.    Land Value

The cost approach encompasses two separate and distinct components, an estimate of the "current cost of reproducing or replacing the improvements (including an appropriate entrepreneurial incentive or profit), minus the loss in value from depreciation," and an estimate of the land value. The Appraisal of Real Estate, at 36.

In attempting to determine a property's land value, an appraiser may employ one of the following techniques: sales comparison, market extraction, allocation, subdivision development, land residual, or ground rent capitalization. The Appraisal of Real Estate, at 364-365. The sales comparison method involves researching, analyzing, and adjusting sales of similar vacant parcels to render a value conclusion. The market extraction method involves estimating the depreciated cost of a property's improvements from the property's total sale price to arrive at a land value. The allocation method involves deriving an estimated ratio of site value to total property value from comparable sales and applying the ratio to the appraised property. The subdivision development method involves a discounted cash flow analysis where the anticipated gross sales price of finished lots is estimated and the direct costs, indirect costs, and entrepreneurial profit are deducted to determine the estimated net sales proceeds. The estimated net sales proceeds are discounted to present value using a market rate and delineated absorption period. The land residual technique capitalizes the net operating income attributable to the land at market capitalization rates






to estimate the land value. Finally, when property is subject to a ground lease, the ground rent capitalization method applies a market-derived capitalization rate to the market rate ground rent to determine the land value.

Here, to attempt to discern a value for the land beneath Building One, Mansfield's expert performed a comparable sales analysis, analyzing five vacant land sales. The land sales were in: (i) Bayonne, Hudson County; (ii) South Brunswick, Middlesex County; (iii) Marlboro Township, Monmouth County; (iv) Riverdale, Morris County; and (v) Freehold Township, Monmouth County. The properties range in size from 14.367 to 25.655 acres, and the properties were sold between June 2006 and May 2012. The sales prices of the vacant lots range from $292,249 to $522,299, or $33.82 to $70.27 per square foot. Mansfield's expert applied size adjustments to the sales price per square foot for each tax year, of -10% to sales 2, 3, and 4, and -5% to sale 5. No other adjustments were deemed necessary by Mansfield's expert. After analyzing the land sales, Mansfield's expert determined that a $40.00 per square foot value should be attributed to the 123,519 square feet of land underlying Building One. Thus, Mansfield's expert concluded that a value of $4,940,760 (123,519 sq. ft. x $40.00 = $4,940,76) should be attributed to the 123,519 square feet of land beneath Building One.

Mansfield's expert added his land value to the depreciated value of Building One's improvements (each year), plus the net value of the 615 surface parking spaces attributable to Building One, to determine the total value of Building One and its land. Finally, Mansfield's expert added the land and improvement calculations to the value he computed for Building Two and the restaurant pad site under the income capitalization approach to determine the subject property's total value.

Conversely, in discerning a value for the entirety of the subject property's land, Green






Eagle's expert reasoned that because the subject property is a single, undivided property, Building One's land value would be included in the value ascribed to Building Two and the restaurant pad site, under the income capitalization approach. Accordingly, employing the income capitalization method and ascribing the same market rents, vacancy and collection loss factors, stabilized operating expenses (real estate commissions, management, reserves, tenant fit-up costs), and capitalization rates that he applied to the entire shopping center, Green Eagle's expert applied those figures only to Building Two and the restaurant pad site. Green Eagle's expert then added the value he determined for Building Two and the restaurant pad site to the total depreciated value of Building One's improvements (inclusive of the surface parking spaces and the deduction for depreciation, and functional obsolescence). Thus, by adding the total depreciated value of Building One's improvements to the value ascribed to Building Two and the restaurant pad site under the income capitalization approach, Green Eagle expert opined that a total value for the subject property could be determined.

Some support exists for the hybrid methodology advanced by Green Eagle's expert and Mansfield's expert. In Livingston Mall Corp. v. Livingston Twp., 15 N.J. Tax 505 (Tax 1996), a hybrid approach, was accepted by the court for determining the true value of the Livingston Mall, a "super-regional mall containing a gross building area of 1,144,723 square feet," located on 59.6 acres. Id. at 508. There, in attempting to ascribe a value to the mall's land, the plaintiff's expert was unable to find comparable vacant land sales; thus, he "used the equalized value of the land assessment as the land value under the cost approach," or $19,500,000. Id. at 510. Plaintiff's expert then employed both the cost approach and the income capitalization approach to estimate the property's value. Conversely, the defendant's expert attempted to value the mall's land by analyzing sales of six vacant parcels ranging in size "from 0.36 aces to 5.24 acres. The sixth






parcel, located in East Hanover, contained 26.91 acres." Id. at 514. Moreover, the defendant's expert apparently determined, without adequate support, that the "easement benefitting the mall was worth 50% of the fee simple value of the servient tenement." Id. at 514. Thus, the defendant's expert calculated the property's total land value to be $32,185,000. Defendant's expert also employed the cost approach and income capitalization approach to value the mall. However, the defendant's expert's final value conclusions were derived from applying a hybrid approach using the cost approach to value the mall anchor stores and the income approach to value the non-anchor mall stores. Id. at 513.

Judge Crabtree concluded that the income-capitalization approach was not probative of the true value of a super-regional mall. Id. at 522. Rather, he found that the cost approach was a better indicator of the mall anchor stores' value because they were owner-occupied. However, because the non-anchor mall stores and kiosks were owned by the property owner and leased, he concluded that the income-capitalization approach was more appropriate for determining the value of the kiosks and non-anchor stores. Ibid. After employing the Marshall & Swift Valuation Service to ascribe a classification to the mall anchor stores, reviewing the photographic evidence, determining the entrepreneurial profit and the accrued depreciation to be applied, he determined the estimated reproduction cost new, for the mall anchor stores. Additionally, after determining a market rent for the non-anchor stores and kiosks, vacancy and loss allowance, and stabilized expenses, he applied a capitalization rate to develop an estimated value for the non-anchor stores and kiosks. After adding the estimated reproduction cost new of the mall anchor stores to the derived value of the non-anchor mall stores and kiosks, he determined the property's true value. However, as the ratio of assessment to true value was within the Chapter 123 common level range






for all years under appeal, Judge Crabtree affirmed the property's local property tax assessment.

Most importantly however, Judge Crabtree expressed the following:

> even though the court finds the cost approach to be most reliable in determining the true value of the anchor stores, <u>no value has been ascribed to the land underlying those stores. The court's ability to make a finding of true value of the underlying land was hampered by an inadequate record. While the evidence indicates that the anchor stores paid rent to plaintiff under land leases, no proofs were offered as to the amounts of such rents.</u> Moreover, plaintiff's expert submitted no comparable land sales but chose to rely upon the equalized value of the land assessments for his land value estimates, an approach which this court finds completely unacceptable. Defendant's expert's vacant land sales were simply not probative. The different uses and the vast differences in size rendered meaningful comparisons impossible.
>
> [<u>Id.</u> at 527 n. 10 (emphasis added).]

Thus, Judge Crabtree keenly observed that although the mall anchor tenants paid ground rent to the property owner for the land underlying the anchor tenant stores, and the property owner derived an income stream from their use of the land for a fixed period of years, the trial record contained inadequate evidence to enable the court to make a finding of what the land's true value was.

Here, the court faces the same challenges and obstacles. Mansfield's expert attempted to use vacant land sales to determine the value of the land beneath Building One. Conversely, Green Eagle's expert failed to consider or analyze the land beneath Building One as excess land for development in deriving a value for the subject property.

Excess land is "surplus land not needed to support the existing improvements." <u>M.I. Holdings, Inc. v. Jersey City</u>, 12 N.J. Tax 129, 137 (Tax 1991). Excess land possesses a separate and distinct value and the ability to be developed, generate an income stream, and/or be sold






separately from the balance of the property. Appraisal Institute, <u>The Appraisal of Real Estate</u>, 214 (13th ed. 2008).

Here, the land beneath Building One can be developed separately from Building Two and the restaurant pad site, as a one-story building consisting of 123,519 square feet was constructed on it. Moreover, Green Eagle derives an income stream from leasing the land. Importantly, however, the income derived from leasing that portion of the subject property's land is not reflected in the income of Building Two and the restaurant pad site. Thus, Green Eagle's expert's opinion that the value of the land beneath Building One is accounted for under the income capitalization approach to Building Two and the restaurant pad site is misguided. When employing the cost approach to value Building One, the value of the land or the income stream being generated from the land must be accounted for in determining true value.

In addition, the subject property constitutes one undivided parcel, not two separate and distinct parcels. Thus, the land underlying Building One does not have the ability to be sold without subdivision. However, Mansfield's expert offered no evidence with respect to the ability to subdivide the subject property's land into separate and distinct lots or the costs that would be associated with such a subdivision, or whether subdivision approval was even reasonably probable. Each of Mansfield's expert's comparable land sales possesses the ability to be sold. Thus, using vacant land sales without corresponding adjustments derived from the market to account for these differences renders Mansfield's expert's vacant land sales of dubious value. Moreover, Mansfield's expert's vacant land sales are located across several counties in the state, approximately 39 to 59 miles from the subject property. The court finds that their distant location renders them not comparable to the subject property. Finally, the subject property is a community shopping center comprising 272,046 square feet of leasable area, not a super-regional mall






containing more than 1,144,723 square feet. Thus, the court finds that the use of the hybrid approach, adopted by Judge Crabtree in <u>Livingston Mall Corp.</u>, is not probative of the subject property's value.

Accordingly, without an adequate trial record to discern the value of the land underlying Building One, the court cannot afford either of the experts' hybrid approaches to value in these matters any weight.

### 3. Corrected Local Property Tax Assessment

Having reached a conclusion of the subject property's true or market value, the court will determine the correct assessments for the subject property for the 2014, 2015, 2016, 2017, and 2018 tax years. Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b). The formula for determining the subject property's ratio is:

$$\text{Assessment} / \text{True Value} = \text{Ratio}$$

When the ratio of assessed value exceeds the upper limit or falls below the lower limit, the formula for determining the revised taxable value of the property, under N.J.S.A. 54:51A-6(a), is as follows:

$$\text{True Value} \times \text{Average Ratio} = \text{Revised Taxable Value}$$

In 2014, Mansfield conducted a municipal-wide revaluation. Therefore, for the 2014 tax






year Chapter 123 is not applicable, and the ratio is deemed to be 100%. See N.J.S.A. 54:51A-6d;

Brown, 19 N.J. Tax at 373; Elrabie v. Franklin Lakes Bor., 24 N.J. Tax 158, 179-180 (Tax 2008).

Consequently, the subject property's assessment for the 2014 tax year is $32,100,000.

Accordingly, a judgment establishing the subject property's tax assessment for the tax year

2014 will be entered as follows:

| | |
|---|---|
| Land | $13,736,300 |
| Improvement | $18,363,700 |
| Total | $32,100,000 |

For the 2015 tax year, the ratio of total assessed value, $33,190,600, to true market value,

$32,100,000, yields a ratio of 1.034% ($33,190,600 / $32,100,000 = 1.034%), which exceeds

100%. Consequently, the subject property's assessment calculation for the 2015 tax year is:

$32,100,000   x   .9621   =   $30,883,400 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject

property for tax year 2015 will be entered as follows:

| | |
|---|---|
| Land | $13,736,300 |
| Improvement | $17,147,100 |
| Total | $30,883,400 |

For the 2016 tax year, the ratio of total assessed value, $33,190,600, to true market value,

$32,100,000, yields a ratio of 1.034% ($33,190,600 / $32,100,000 = 1.034%), which exceeds

100%. Consequently, the subject property's assessment calculation for the 2016 tax year is:

$32,100,000   x   .9467   =   $30,389,100 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject

property for tax year 2016 will be entered as follows:

| | |
|---|---|
| Land | $13,736,300 |
| Improvement | $16,652,800 |
| Total | $30,389,100 |






For the 2017 tax year, the ratio of total assessed value, $33,190,600, to true market value, $32,100,000, yields a ratio of 1.034% ($33,190,600 / $32,100,000 = 1.034%), which exceeds 100%. Consequently, the subject property's assessment calculation for the 2017 tax year is:

$32,100,000   x   .9414   =   $30,218,900 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject property for tax year 2017 will be entered as follows:

| | |
|---|---|
| Land | $13,736,300 |
| Improvement | $16,482,600 |
| Total | $30,218,900 |

For the 2018 tax year, the ratio of total assessed value, $33,190,600, to true market value, $32,100,000, yields a ratio of 1.034% ($33,190,600 / $32,100,000 = 1.034%), which exceeds 100%. Consequently, the subject property's assessment calculation for the 2018 tax year is:

$32,100,000   x   .9262   =   $29,731,000 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject property for tax year 2018 will be entered as follows:

| | |
|---|---|
| Land | $13,736,300 |
| Improvement | $15,994,700 |
| Total | $29,731,000 |

Contemporaneously with the issuance of this opinion, the court is entering the above-referenced judgments.

Very truly yours,

Hon. Joshua D. Novin, J.T.C.




